Filed 10/6/22  P. v. Munoz CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR JAMES MUNOZ,<br><br>    Defendant and Appellant. | F083731<br><br>(Super. Ct. No. CR33481)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Poochigian, Acting P. J., Detjen, J. and Peña, J.

## INTRODUCTION

Petitioner Victor James Munoz petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for the second degree murder of Manuel Gonzales, Jr.  The superior court held an evidentiary hearing (§ 1172.6, subd. (d)(1)) and denied the petition after finding petitioner was a major participant in the underlying offense and acted with reckless indifference to human life.

Appointed counsel for petitioner asked this court to review the record to determine whether there are any arguable issues on appeal.  (*People v. Wende* (1979) 25 Cal.3d 436.)  Petitioner was advised of his right to file a supplemental brief within 30 days of the date of filing of the opening brief.  More than 30 days elapsed and we received no communication from petitioner.  Finding no arguable error that would result in a disposition more favorable to petitioner, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### I.     Underlying Conviction

Petitioner's criminal trial commenced on July 16, 1991, and proceeded on an information charging him with the murder of Gonzales in the perpetration or attempted perpetration of a robbery (§ 187, subd. (a); count I), and the second degree robbery of Gonzales (§ 211; count II).  On July 17, 1991, the district attorney filed a first amended information, charging petitioner with the murder and second degree robbery of Gonzales.  On the same date, petitioner pled guilty to both offenses, on the stipulation that the offense in count I would be set at murder in the second degree.  On count I, petitioner was sentenced to a term of 15 years to life.  Sentence on count II was imposed and stayed.

---

[1] Undesignated statutory references are to the Penal Code.  Former section 1170.95 recently was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  We will refer to the current section 1172.6 in this opinion.

## II.    The Petition for Resentencing

On October 6, 2020, petitioner filed a section 1172.6 petition for resentencing on his murder conviction.[2]  The court appointed counsel to represent petitioner and, following further briefing, set the matter for an evidentiary hearing.

## III.    The People's Memorandum

In advance of the hearing, the People submitted a memorandum arguing the evidence established petitioner was guilty of murder as a direct aider and abettor or as a major participant in the underlying felony who acted with reckless indifference to human life.  Included with the memorandum were nearly 300 pages of documents marked collectively, and without further explanation or differentiation, as "EXHIBITS." Included therein were three transcripts purporting to be from taped law enforcement interviews with petitioner, a transcript from petitioner's preliminary examination, a transcript from petitioner's change of plea hearing, a probation report prepared in relation to petitioner's initial sentencing, and a transcript of the original sentencing proceedings.[3] We briefly summarize the relevant aspects of People's evidence.

### A.    Transcripts of Interviews

The People provided three transcripts purporting to be from law enforcement interviews of petitioner.

---

[2] The petition was stamped as received on April 6, 2020.  It appears the petition was held in chambers prior to filing.

[3] The People submitted additional documents, which the superior court did not rely on in resolving the petition.  Because these documents were not considered by the court, we do not discuss them.  Additionally, although the court considered the transcript of the original sentencing proceedings, that transcript does not contain significant information regarding the circumstances of the offenses.  We therefore do not discuss the sentencing transcript further.

3.

The first interview was conducted on March 23, 1990,[4] by investigators from the Tuolumne County Sheriff's Department. Petitioner informed the investigators that he was at his father's house with his girlfriend and children on the date of the incident, when his friend Sam[5] arrived with Gonzales[6] at 5:30 or 6:00 p.m. Sam and Gonzales had been drinking a lot. Eventually, petitioner's father and brother Billy came home, and an argument ensued after Sam declined to move his car. Petitioner moved Sam's car but Sam and Gonzales left soon thereafter, around 7:30 or 8:00 p.m. Petitioner's brother "Butch"[7] then came home "staggering drunk." Petitioner and Butch went to Sam's house to smooth things over and eventually returned home. When petitioner awoke the next morning, Butch told petitioner he had returned to Sam's house and mugged someone there. Butch did not know who he mugged but he did not think it was Gonzales. He "whacked" the person in the back of the head with a board "hella times." Butch thought the person was still alive. Butch took a ring, watch, and black jacket from the victim. Petitioner saw the jacket, which appeared to be the same one Gonzales had been wearing the previous evening. Petitioner's dad found a wallet in the fireplace and Butch took it and said it was his. A few days later, Butch took the ring and watch to an antique store and sold them for $25. The day the body was discovered, Butch "took off" with everything he owned. Petitioner denied telling his girlfriend that he had been in a fight with Gonzales at Sam's house.

---

[4] The murder was alleged to have occurred on or about March 11, 1990.

[5] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[6] Gonzales is referred to throughout the transcripts as Junior or JR.

[7] Petitioner's brother's true name is Robin Munoz, Jr. He is referred to throughout the record by his nickname, Butch. For clarity, we refer to him as Butch. Butch was tried relative to the murder of Gonzales.

The second interview was conducted on March 4, 1991, again by investigators from the Tuolumne County Sheriff's Department. Petitioner again explained that Sam and Gonzales came to his house on the night of the incident, where they drank and partied. Petitioner had never met Gonzales before. Petitioner's father, petitioner's uncle, Billy, and Butch came home and there was some hostility regarding Sam not wanting to move his car. Petitioner moved the car and, when he returned, Sam and Gonzales were leaving. Petitioner had been drinking whisky and was feeling the effects. Petitioner and Butch went to Sam's house to smooth things over. Sam invited them inside for a drink. At some point, a problem started between Butch and Gonzales. Butch and Gonzales went outside. After about 10 to 15 minutes, petitioner went outside and found Butch and Gonzales standing on the porch. The next thing petitioner knew, he heard a "whop" and saw Gonzales fall to the ground. Butch was holding a piece of wood. Petitioner and Butch decided to rob Gonzales and petitioner started going through his pants. Gonzales rolled over and sat up and Butch "whacked" him again. Gonzales sat up again and Butch hit him every time he sat up. Butch hit Gonzales a lot of times on the back of his head. Butch and petitioner left Gonzales between Sam's car and the porch. Gonzales was breathing and petitioner did not see any blood. His breathing sounded like a snore. He was fully clothed. Petitioner did not really think he was hurt. A week or so later, petitioner learned from his aunt that Sam was getting "busted." Petitioner went to Sam's house and saw a hearse and understood that it related to the incident with Gonzales. Petitioner acknowledged that he did not tell the truth in his prior interview.

The third interview was conducted on March 6, 1991, again by investigators with the Tuolumne County Sheriff's Department. Petitioner's description of the incident was substantially similar to his description on March 4, 1991. Petitioner also provided information regarding discussions between family members after the offense.

## B.     Transcript of the Preliminary Examination

Sam testified at the preliminary examination that he was with Gonzales on the afternoon and evening of March 11, 1990.  That evening, he and Gonzales were at Sam's residence with petitioner, Butch, and Sam's girlfriend.  Sam thought Billy also might have stopped by briefly.  Gonzales was wearing blue jeans, a black leather coat, some nice pieces of turquoise jewelry, and a watch.  Sam last saw Gonzales alive at approximately 8:00 p.m. when Sam went to take a bath.  Gonzales was drunk.  Sam left the residence at approximately 8:30 p.m. and, at that time, only petitioner and Sam's girlfriend were in the house.  Sam returned at approximately 11:30 p.m. and found Butch in the residence with Sam's girlfriend.  Petitioner was gone.  When Sam returned, Gonzales's dog came running up to him.

Sam further testified that, at approximately 1:30 p.m. on March 16, 1990, two young boys found Gonzales on Sam's property, 40 to 50 yards from the south corner of the house.  Gonzales was on his back on the ground; he was bloated and dead.  He was wearing only underwear, which was around his ankles.

Petitioner's stepfather testified that Sam and Gonzales came to his house on March 11, 1990.  Butch and petitioner left the house at approximately 8:00 p.m. and went to Sam's.  They returned at approximately 10:00 p.m.  Petitioner went into the bedroom and Butch said that he was going back to Sam's.  Later that week, petitioner's stepfather found a wallet on the living room table.

Sam's girlfriend testified that she saw Gonzales at Sam's residence the night of the incident and he was very drunk.  Petitioner and Butch came over in the early evening and there was a discussion regarding Gonzales being rude to one of their girlfriends.  Gonzales and Butch went outside and later came back in and were not angry.  At some point, Sam left the house.  Eventually, Gonzales and Butch left again and Gonzales never came back.  Petitioner also left.  Butch returned later that night.

6.

Petitioner's girlfriend's sister, Charlotte, spoke with petitioner after Gonzales's body was found. Petitioner said something about Butch hitting the guy with a club over and over while petitioner was urinating. On another occasion, petitioner asked Charlotte whether she wanted a black leather jacket. She told petitioner to put the jacket in her car. She found the jacket four or five days later and it was soaked in blood. She asked her son if he wanted it and he took it and burned it. Charlotte did not know whether the jacket belonged to the murder victim. Charlotte also encountered Butch on the day the body was discovered or the next day. He was hitchhiking and she picked him up.

Billy testified that he came home on the night of the incident and Sam and another man were arguing. The man was wearing a black leather jacket. The man was drunk and could not stand up. Petitioner and Butch left the house and, when they returned around 7:30 or 8:00 p.m., they were arguing. Petitioner went to his room and Butch left again. That night, Billy's dad found a wallet and Butch grabbed the wallet and threw it in the fireplace. The next day, Billy saw the black leather jacket under Butch's bed.

Tuolumne County Sheriff's Investigator K. Lunney testified that Gonzales's body was found near Sam's property. He further testified that he reviewed an autopsy report, wherein the doctor opined that Gonzales died from a head injury caused by a large, flat object, similar to a two by four piece of wood. He also reviewed the doctor's testimony from Butch's trial, wherein the doctor opined the injuries resulted from more than one blow. Lunney also testified that he interviewed petitioner on March 4, 1991. Lunney testified to statements made by petitioner during the interview, consistent with our summary of that interview, above.

C.      **Transcript of Change of Plea Hearing**

When petitioner pled guilty to second degree murder and second degree robbery, the court queried defense counsel on the factual basis for the plea. Defense counsel represented the factual basis was as follows: "[Petitioner], his brother [Butch] and the decedent J.R. Gonzales were standing on the porch of Sam['s] house March 1990; that

[Butch] hit J.R. Gonzales, the decedent, in the back of the head, knocking him to the ground; that thereafter, [Butch] and [petitioner] jumped down where they could see he was lying [*sic*]. He was still alive at the time. [¶] And [petitioner] stuck – crouched in front of Mr. Gonzales, put his hands into the front pockets, and was in the process of removing change when Mr. Gonzales sat back up. [Petitioner] told his brother to hit Mr. Gonzales again so that he won't interfere with the taking of the money. That [petitioner] knew that striking a person in the head with a piece of firewood was dangerous, dangerous to life; that he did not have the permission to take the money; and that he intended to keep it."

Immediately thereafter, the court engaged petitioner in the following colloquy:

"THE COURT:     [Petitioner], is that correctly stated?

"[PETITIONER]:   Yes, sir.

"THE COURT:     And you admit each of those facts?

"[PETITIONER]:   Yes, sir."

### D.     Probation Officer's Report

The probation officer's report included a summary of the circumstances surrounding the offense. That summary was taken primarily from the preliminary examination testimony and petitioner's interviews. However, the probation officer's report also summarized the autopsy report, which detailed Gonzales's injuries and identified his cause of death as head injuries. The report also summarized Lunney's March 24, 1990 interview of Butch, in which Butch initially denied involvement in the offense but later stated Gonzales pushed Butch and called him names, at which point Butch picked up a stick and hit Gonzales four or five times in the back of the head. Gonzales fell down and Butch mugged him. Butch stated he had no help in doing so but did tell petitioner what happened. Butch stated that Gonzales still had a pulse when he returned to Sam's house an hour and a half later, and Butch pulled him in to the bushes,

8.

which resulted in Gonzales's pants being pulled down. Butch took off Gonzales's boots and jeans and threw them in a dumpster. He took Gonzales's wallet, a ring, a watch, and $4 in change. The probation officer's report also contained a statement from petitioner in which he admitted " 'participat[ing] in the death of another person.' "

## IV. Petitioner's Reply

In reply, petitioner argued the robbery was not preplanned, and his actions did not involve reckless indifference to human life or an intent to kill. Additionally, he objected to: (1) the transcripts of his own interviews on hearsay grounds; (2) the transcript of the preliminary examination on hearsay and confrontation grounds; (3) the transcript of the change of plea on relevance and hearsay grounds; and (4) the probation report on relevance and hearsay grounds.

## V. The People's Reply

Relying on *People v. Williams* (2020) 57 Cal.App.5th 652, the People argued the superior court was not bound by the rules of evidence in a section 1172.6 evidentiary hearing, and therefore could consider hearsay evidence so long as there was a substantial basis for believing the hearsay information is reliable. The People argued the evidence "adequately" established petitioner aided and abetted in the murder with at least implied malice.

## VI. Hearings

On November 8, 2021, the matter came on for hearing and the parties discussed the evidentiary objections. Defense counsel suggested continuing the matter to January 2022, when amendments to former section 1170.95 would take effect, specifying that the admission of evidence at the hearing is governed by the Evidence Code. (See § 1172.6, subd. (d)(3); see also Senate Bill No. 775 (2021-2022 Reg. Sess.), stats. 2021, ch. 551 (Senate Bill No. 775).) The matter was continued to November 19, 2021.

On November 19, 2021, the court identified the evidentiary objections as a threshold matter that required resolution prior to reaching the merits of the case.

Petitioner's counsel pointed out that *Williams* would be abrogated by Senate Bill No. 775, which was set to take effect on January 1, 2022, and which specifies that the Evidence Code applies to section 1172.6 evidentiary hearings. Petitioner's counsel additionally pointed out that Senate Bill No. 775 generally prohibits the court from considering evidence admitted at a preliminary hearing pursuant to section 872, which, in this case, included testimony regarding the victim's autopsy. Petitioner's counsel conceded that testimony regarding petitioner's own statements would be admissible pursuant to a hearsay exception (Evid. Code, § 1220), but pointed out that the interview transcripts themselves had not been authenticated. The People argued the petition could be denied solely based on petitioner's statements. The matter was continued for the court to consider the evidentiary objections.

The parties returned on December 10, 2021. The court determined *Williams* was persuasive with regard to the admissibility of hearsay testimony. On that basis, the court overruled petitioner's objections to the preliminary hearing transcript. The court also determined the transcript of the change of plea hearing was admissible, and the court found that petitioner's admission of the facts provided as the factual basis for the plea constituted an adoptive admission and was admissible on that basis. The court admitted the transcripts of petitioner's interviews as admissions of a party (Evid. Code, § 1220) and statements against interest (Evid. Code, § 1230), without addressing petitioner's authentication objection. The court additionally admitted the probation report.

The court stated it had reviewed the preliminary examination transcript, the interviews with petitioner, the transcript of the change of plea, the probation report, and the sentencing transcript. The court identified the relevant issue as whether petitioner was a major participant in the underlying felony who acted with reckless indifference to human life, and identified the relevant cases on that point as *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). The court identified the following facts, derived from petitioner's statements and the preliminary

10.

examination transcript as relevant: Butch struck the first blow to Gonzales, knocking him to the ground. Petitioner and Butch looked at one another and decided to rob Gonzales. Butch continued to hit Gonzales multiple times while the robbery was taking place, and petitioner did nothing to intervene. Gonzales died from head trauma caused by someone hitting him in the head. Additionally, based on petitioner's admission at the change of plea, the court found it relevant that petitioner and Butch left Gonzales in the dirt, gurgling or snoring. Petitioner did not attempt to get assistance for Gonzales and wanted to keep things quiet when he returned home to his family. Petitioner also admitted that he told Butch to hit Gonzales again when Gonzales kept sitting up, to prevent Gonzales from interfering with the robbery.

The court surmised, "I cannot imagine a situation that . . . shows greater indifference to human life than telling someone to hit another person in the head with a piece of wood to stop them from preventing you from robbing them." The court determined the People had proved beyond a reasonable doubt petitioner was a major participant in the robbery who acted with reckless indifference to human life based on his being an instigator of the decision to rob Gonzales, his awareness that Gonzales was being hit with a piece of wood to prevent his interference in the robbery, his telling Butch to hit Gonzales to prevent him from interfering with the robbery, and his failure to intervene or assist Gonzales. On that basis, the petition was denied.

This timely appeal followed.

## DISCUSSION

### I. Pertinent Law Regarding the Evidentiary Hearing

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."

11.

(Stats. 2018, ch. 1015, § 1, subd. (f).) The bill amended the natural and probable consequences doctrine by requiring that a principal act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*).) The bill amended the felony-murder rule by providing that a participant in a qualifying felony is liable for murder only if the victim was a peace officer in the performance of his or her duties, or the defendant was the actual killer, aided and abetted the actual killer in the commission of first degree murder with the intent to kill, or was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subds. (e), (f); accord, *Gentile*, at p. 842.)

Senate Bill No. 1437 also added former section 1170.95, now renumbered as section 1172.6, which provides a procedure for persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to seek vacatur of the conviction and resentencing. (§ 1172.6, subd. (a); accord, *Gentile*, *supra*, 10 Cal.5th at p. 853.) Under this procedure, an offender must file a petition in the sentencing court. (§ 1172.6, subd. (a)(1)-(3); see § 1172.6, subd. (b)(1)(A).)

If the trial court determines the petitioner has made a prima facie showing that he or she is entitled to relief, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1172.6, subds. (c), (d)(1).) At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) Significantly, "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.)

12.

The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).)

We review the trial court's findings following the evidentiary hearing for substantial evidence, and the application of those facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.)

## II.    Analysis

The court found the evidence proved, beyond a reasonable doubt, that petitioner is guilty of murder under the law as amended by Senate Bill No. 1437, because the evidence established petitioner was a major participant in the robbery who acted with reckless indifference to human life. (See §§ 189, subd. (e), 1172.6, subd. (d)(3).) Substantial evidence supports this finding.

*Banks* and *Clark* are the leading cases providing guidance on the "major participant" and "reckless indifference" elements of felony murder. *Banks* identified a series of considerations to help guide the inquiry into whether a defendant is a major participant: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) The high court explained that none of these considerations is dispositive, and "[a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a

13.

grave risk of death' [citation] was sufficiently significant to be considered 'major.' [Citation.]" (*Ibid.*)

*Banks* also touched on the reckless indifference element, holding that knowing participation in an armed robbery, standing alone, is insufficient to establish a defendant's reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at pp. 807-811.) The high court provided further guidance on this element in *Clark*, holding " 'reckless indifference,' . . . encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) As in *Banks*, the court "set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*People v. Strong* (2022) 13 Cal.5th 698, 706; see *Clark*, at pp. 618-623.)

Substantial, admissible evidence from the transcript of the preliminary examination supports the superior court's finding that petitioner was a major participant in the robbery and acted with reckless indifference to human life. Lunney testified to his interview with petitioner, in which petitioner admitted he was physically present at the robbery and did not intervene to prevent the murder. Petitioner stated to Lunney that he and Butch decided jointly to rob Gonzales, and petitioner continued to rob Gonzales as Butch continued to hit him on the head. Furthermore, petitioner admitted during the change of plea hearing that he told Butch to hit Gonzales again to prevent Gonzales interfering with the robbery, and that he knew that such conduct was dangerous to human

14.

life.[8]  This evidence is sufficient to support the superior court's finding that petitioner was a major participant in the robbery and acted with reckless indifference to human life.

We acknowledge some evidence considered by the superior court is no longer admissible pursuant to Senate Bill No. 775.[9]  For the most part, however, this evidence was cumulative of the other, admissible evidence.  To the extent the record before the court included inadmissible hearsay regarding the results of the autopsy of Gonzales, the superior court also noted it "does not require a great deal of knowledge of human life to know that repeated blows to the head with a hard object is . . . capable of causing death."  Furthermore, the court did not specifically rely on the autopsy results in determining petitioner was a major participant and acted with reckless indifference to human life.  Additionally, to the extent the People failed to authenticate the transcripts of petitioner's interviews with law enforcement, those interviews were cumulative of Lunney's testimony.  Accordingly, to the extent evidence was erroneously admitted, it is not reasonably probable petitioner would have achieved a more favorable result in the absence of such error.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)  Accordingly, the improper admission of evidence, if any, was harmless.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

---

[8] The factual basis offered to support a change of plea may have limited probative value in the section 1172.6 context.  (See, e.g., *People v. Rivera* (2021) 62 Cal.App.5th 217, 235-236.)  Here, however, petitioner's counsel did not merely stipulate to a factual basis for the plea.  Rather, petitioner "admit[ted] each of those facts" recited by his counsel.  Petitioner's statement is admissible, and it was for the court, as trier of fact, to determine the weight of this evidence.  (See *People v. Turner* (2020) 10 Cal.5th 786, 805 [trier of fact determines weight to give admissible evidence].)

[9] In *People v. Owens* (2022) 78 Cal.App.5th 1015, a majority of the court suggested the procedural rules amended by Senate Bill No. 775 are not retroactive.  We need not resolve this issue because, as we explain, any violation of those amended rules is harmless.

## DISPOSITION

The order is affirmed.